# In the United States Court of Federal Claims

No. 22-642L
(Filed: September 22, 2025)
**FOR PUBLICATION**

***************************************
| | |
|---|---|
| RICHARD T. SCARPACI, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

***************************************

*Anna C. Broxmeyer*, Law Office of Yuriy Prakhin, P.C., Brooklyn, N.Y. Also on the briefs was *Gil Zohar*, Law Office of Yuriy Prakhin, P.C., Brooklyn, N.Y.

*Dustin J. Weisman*, Natural Resources Section, U.S. Department of Justice, Denver, CO. Also on the briefs were *Matthew P. Rand* and *William J. Shapiro* of the Natural Resources Section, U.S. Department of Justice, Denver, CO, *Todd Kim*, Assistant Attorney General, *Lisa Lynne Russell*, Deputy Assistant Attorney General, *Adam R. F. Gustafson*, Acting Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., and *Charles W. Johnson*, Of Counsel, U.S. Army Corps of Engineers, New York District.

## OPINION AND ORDER

Plaintiffs bring a takings claim against the United States, alleging that their land was permanently occupied by the government without just compensation. *See* Compl. (ECF 1). After I granted Defendant's motion to dismiss the original complaint, *see* Opinion & Order (ECF 16), Plaintiff filed an amended complaint, Am. Compl. (ECF 34), which Defendant has again moved to dismiss under Rule 12(b)(1) or Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Def.'s Mot. at 2 (ECF 37). The motion has been fully briefed, and I have heard oral argument.[1]

---

[1] *See* Plaintiffs' Response in Opposition ("Pls.' Resp.") (ECF 40); Defendant's Reply ("Def.'s Reply") (ECF 41); Transcript of Oral Argument ("Tr.") (ECF 43). I requested two sets of supplemental briefs. *See* Def.'s Suppl. Br. on 2004 Final Report (ECF 50); Pls.' Suppl. Br. on 2004 Final Report (ECF 54); Def.'s Suppl. Br. on *Etchegoinberry* (ECF 57); Pls.' Suppl. Br. on *Etchegoinberry* (ECF 58).

Plaintiffs have adequately pleaded that a taking occurred within the applicable statute of limitations. But some Plaintiffs did not own their properties at the time of the taking, and therefore lack standing. Defendant's motion is therefore **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

### I. Legal Background

The Fifth Amendment categorically obligates the government to compensate property owners for permanent, physical occupations of their land. U.S. Const. amend. V; *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982). That includes situations where, as a result of government action, "real estate is actually invaded by superinduced additions of water, earth, sand or other material[.]" *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166, 181 (1871).

This Court only has jurisdiction over a claim for six years after the date when it accrues. 28 U.S.C. § 2501. The accrual standard — which hinges in cases like this one on determining when the taking has "stabilized," *Mildenberger v. United States*, 643 F.3d 938, 945–46 (Fed. Cir. 2011) — will be discussed in more detail below. Once accrual takes place, though, the time limit is jurisdictional. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008).

When the government moves to dismiss for lack of jurisdiction under RCFC 12(b)(1), uncontested factual allegations are taken as true and construed in the plaintiff's favor. *See Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). But when jurisdictional facts are contested, the Court can resolve factual disputes by weighing evidence outside the pleadings and making findings. *Id.*; *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991) ("Because the truth of a jurisdictional fact was brought into question, the Claims Court appropriately allowed the parties to submit relevant evidence in order to resolve the factual dispute."); *Newtech Rsch. Sys., L.L.C. v. United States*, 99 Fed. Cl. 193, 200 (2011), *aff'd*, 468 F. App'x 985 (Fed. Cir. 2012). When the government challenges the factual basis for jurisdiction, the plaintiff must prove facts sufficient to establish jurisdiction by a preponderance of the evidence. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936).

When resolving motions to dismiss under RCFC 12(b)(6), this Court may dismiss a complaint if the plaintiff has not "plead[ed] factual allegations that support

a facially 'plausible' claim to relief[.]" *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

## II. Factual Background

### A. The Taking

Plaintiffs own oceanfront properties on the northwest shore of Coney Island in Brooklyn, New York. Their homes are part of the Sea Gate community, with addresses along Oceanview Avenue and the waters of Gravesend Bay just across bulkheads in their back yards. Am. Compl. ¶¶ 4, 25–46. Norton Point is on the shore to the west of Plaintiffs' properties. *See* Am. Compl. ¶ 5. The Sea Gate beach lies on the southwest shore of Coney Island, directly southward across the island from Plaintiffs' properties, adjacent to the Coney Island public beach. Am. Compl. ¶¶ 4–5.



Def.'s Mot. at 4.



Pls.' Resp. Ex. 4 at 3 ("Sea Gate Project Presentation") (ECF 40-4).

In the decades leading up to the 1990s, the Sea Gate Beach and the Coney Island beach experienced severe erosion. Am. Compl. ¶ 2. To address the erosion, the United States Army Corps of Engineers ("Corps") undertook the "Coney Island Project." Am. Compl. ¶¶ 2–3, 5. The Coney Island Project involved constructing a beach berm and terminal groin to provide shore protection. Am. Compl. ¶ 2. It also included placing three million cubic yards of sand along the Coney Island and Sea Gate beaches, with periodic renourishments planned on a ten-year cycle. Am. Compl. ¶¶ 2–3. The Coney Island Project was completed in January 1995. Am. Compl. ¶ 3.

"Within approximately two years" after the Coney Island Project was completed, "homeowners along the Gravesend Bay (on Oceanview Avenue) or north side of the Sea Gate Community began to notice the accretion of sand" on the shores of their properties. Am. Compl. at ¶¶ 3–4. In 1998, the Army Corps completed a study on the effects of the Coney Island Project, which indicated that "the eroding sand from Sea Gate Beach was, unexpectedly, accumulating on the north side of Coney Island in Sea Gate along Gravesend Bay." Def.'s Mot. Ex. 1 ¶ 4 ("Decl. of Ciorra") (ECF 37-1) (providing the statement of Anthony Ciorra, the Chief of the Coastal Restoration Branch for the Corps); *see* Def.'s Mot at 6. Aerial photos showing the Coney Island region from 1996–2014 confirm that a significant accumulation of sand was present by the late 1990s. *See* Def.'s Mot. Ex. 3 at 2–11 ("Aerial Photos") (ECF 37-3). There is no dispute that the accretion of sand was caused by the Coney Island Project, and that it constituted a compensable taking. Am. Compl. ¶¶ 1, 6, 48; *see generally* Def.'s Mot.

The sand accumulation at Gravesend Bay has been the subject of two previous takings lawsuits in this Court, both brought by Plaintiffs' neighbors. This Court's decisions in those cases fixed the date of the taking on December 31, 1995. *See Vaizburd v. United States*, 57 Fed. Cl. 221, 230 (2003), *vacated*, 384 F.3d 1278 (Fed. Cir. 2004) (vacating for calculation of damages but affirming the trial court's factual findings); *Prakhin v. United States*, 122 Fed. Cl. 483, 489 (2015). The first case led to an award of damages. *Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (2005). The other settled before trial. Stipulation of Dismissal (ECF 171), *Prakhin v. United States*, No. 14-924L (Fed. Cl. filed Sept. 29, 2014).

**B. Remediation Efforts**

After the sand from the Coney Island Project began accreting at Gravesend Bay, the Corps engaged in various remediation efforts. Am. Compl. ¶ 5. The parties disagree about what those efforts were supposed to accomplish. That disagreement involves a dispute over jurisdictional facts, which I resolve as follows.

Plaintiffs declare under penalty of perjury that they believed the Corps would entirely clear the accumulated sand and restore the Gravesend Bay shore to its condition before the Coney Island Project. Am. Compl. ¶¶ 16, 53–55; Pls.' Resp. Ex. 3 at 2–14 ("Pls.' Affidavits") (ECF 40-3).[2] Although the government observes that Plaintiffs' declarations are in identical boilerplate language, Def.'s Reply at 6–7, I assume — for purposes of a paper record on a motion to dismiss — that they have truthfully described their subjective expectations.

The declarations, as the government also points out, do not detail the basis of Plaintiffs' expectations. Def.'s Reply at 6–7; Tr. at 11–12, 25–26. But Plaintiffs have also submitted a declaration of Stephen Michael Breslof, a former officer of the Sea Gate homeowners association. Pls.' Resp. Ex. 2 ("Decl. of Breslof") (ECF 40-2). Mr. Breslof declares that he met repeatedly with officials of the Corps, who assured him that the waterfront would be restored to its original condition. *Id.* He also declares

---

[2] Courts regularly refrain from considering unauthenticated evidence in the context of motions to dismiss for lack of subject matter jurisdiction. *E.g.*, *Frank v. Wells Fargo Bank, N.A.*, 620 F. Supp. 3d 1024, 1027 (C.D. Cal. 2022); *Rsch. Inst. for Med. & Chemistry, Inc. v. Wisconsin Alumni Rsch. Found., Inc.*, 647 F. Supp. 761, 773 n.8 (W.D. Wis. 1986); *see also Burnett v. Central Bank of Belize*, 656 F. Supp. 3d 902, 910 (D. Alaska 2023) (declining to consider documents proffered by the plaintiff to establish subject matter jurisdiction because the documents lacked proper foundation). Plaintiffs attached to their response, as Exhibit A, a document without an authenticating declaration. *See* Pls.' Resp. Ex. 1 (ECF 40-1). The government disputes Plaintiffs' characterization of that document, *see* Def.'s Reply at 7–8; Tr. at 73–74, 81, and at argument, Plaintiffs' counsel could not confirm what the document is, Tr. at 81. Because the document lacks an authenticating declaration, or any other foundation for that matter, I will not consider it for purposes of establishing jurisdiction.

that he was responsible for keeping Sea Gate residents informed of his meetings with the Corps, and that he relayed the Corps's assurances. *Id.*

Most importantly, the government also asserts that the Corps never promised a complete remediation, but only to remove some sand and reduce the rate of accretion. Def.'s Mot. at 13–14. That calls for review of the Corps's remediation efforts and public statements.

The Corps's initial efforts began in 1998 with the previously mentioned postconstruction analysis of the effects of the Coney Island Project. Def.'s Mot. at 6. That study concluded that the construction of T-groins would help with project performance and decrease erosion at Sea Gate Beach. *Id.*; Decl. of Ciorra ¶ 4. Beginning in 2000, the Corps periodically moved 100,000 cubic yards of sand from the waters near Norton Point and onto Sea Gate Beach. Am. Compl. ¶ 5. These efforts "only achieved temporary results and did not restore the properties along Gravesend Bay/Oceanview Avenue to the condition they were in prior to the Coney Island Project." *Id.* The Corps then met with residents of the Sea Gate community to develop a new remedy for the sand accumulation issue. Am. Compl. ¶ 8; *see* Decl. of Breslof.

Between 2002 and 2004, the Corps prepared "proposed and final Limited Reevaluation Reports and Environmental Assessments" that presented plans to address "the issue of the loss of sand fill at Sea Gate Beach and the accumulation of sand along the Gravesend Bay/Oceanview Avenue properties." Am. Compl. ¶ 9. The Corps's Final Limited Reevaluation Report and Final Environmental Assessment ("FLR Report"), issued in 2004, selected "Alternative 7" known as the "Beach Fill with T-Groins" plan. Def.'s Mot. Ex. 2 at 13 ("FLR Report") (ECF 37-2).[3] These plans were sometimes called the "Sea Gate Project" or the "T-Groin Project." *See* Def.'s Mot. at 6; Am. Compl. at 3; *see also Prakhin*, 122 Fed. Cl. at 485 ("The Sea Gate Project was intended to solve the problems of rapid sand erosion in Sea Gate and accretion of sand along Gravesend Bay.") (internal quotes omitted).

The selected alternative was intended to "achieve[] the three primary project goals of providing protection to the West 37th Street groin, reducing the accumulation of sand in Gravesend Bay, and avoiding recession from the 1988 shoreline." FLR Report at 13. The FLR Report projected that the T-groins "should significantly reduce accumulation of material in Gravesend Bay due to stabilization of the shoreline." *Id.* at 48. To accomplish these goals, the FLR Report explained in response to public comments that:

---

[3] Citations to the FLR Report refer to the ECF file-stamp pagination.

- 6 -

> There is an estimated 30,000 [cubic yards] of sand that has accreted on the Gravesend Bay shoreline above elevation 0 feet NGVD. This sand will eventually be removed after the construction of the T-groins is completed. The [Corps] will remove sand with land-based equipment down to elevation 0 feet NGVD.

Am. Compl. ¶ 12 (quoting FLR Report at 288); *see also* Def.'s Mot. at 27 n.10 ("'NGVD' means 'National Geodetic Vertical Datum.' 0 feet NGVD is approximately sea level.") (quoting FLR Report at 12).

The FLR Report also contained a discussion about the source of sand fill for the T-groins. FLR Report at 73–74. The FLR Report explained the Corps's decision to obtain the sand from Gravesend Bay, among other places. *Id*. It also stated that "[u]se of this material, removed from above the mean high water line, *would tend to eventually restore the shoreline to prior prevailing depths and shoreline configuration*, especially if done in conjunction with effective measures to reduce the losses on the Sea Gate oceanside shore." *Id*. at 74 (emphasis added).

After a delay in securing congressional funding and state approval, the T-Groin Project began in 2013 and was completed in June 2016. Am. Compl. ¶¶ 17–20.

The *Vaizburd* and *Prakhin* litigation is also potentially relevant to what Plaintiffs could reasonably have expected from the Corps's remediation efforts. In *Vaizburd*, this Court's post-trial findings concluded that "whatever the Corps planned to do by way of sand removal" as of 2003 "would not have restored the pre-taking condition." 57 Fed. Cl. at 224. The Corps's representative posited that "the only long term solution to the Gravesend problem will be implementation of the Corps' [sic] current plan to construct a series of 'T-groins' on Sea Gate Beach." *Id*. Although the Court was "hopeful" about what would later become the T-Groin Project, it found "the mere possibility of remedial structures … insufficient to preclude a finding that the sand is an inevitably recurring phenomenon." *Id*. at 227. By this Court's 2015 decision in *Prakhin*, the government disavowed any plans to completely remediate, representing that the Sea Gate Project never proposed "to remove sand from *any* properties, including Plaintiff's[,]" and "that the Sea Gate Project would not mitigate the alleged taking, but instead prevent further accretion." 122 Fed. Cl. at 487 (emphasis added), 490.

### C. Procedural History

This case was initially filed on June 10, 2022. Compl. (ECF 1). Defendant moved to dismiss based on the statute of limitations. Def.'s First Mot. to Dismiss at 1 (ECF 6). That motion was granted on May 31, 2023, but the Court also offered Plaintiffs the opportunity to refile an amended complaint that provided evidence

supporting their theory that the taking did not stabilize, and the claim did not accrue, until a time late enough to make the claim timely. *See* Opinion & Order at 3.

The parties reached a tentative settlement agreement soon after, Joint Mot. for Stay (ECF 17), and the case was stayed. Order Granting Stay (ECF 18). But when the parties failed to complete the settlement, the stay was lifted, Pls.' Mot. to Lift the Stay (ECF 32); Order Granting Pls.' Mot. to Lift the Stay (ECF 33), and Plaintiffs filed their amended complaint. Defendant's current motion to dismiss followed.

## DISCUSSION

There is no question that this Court has subject-matter jurisdiction over takings claims.[4] Nor is there any dispute that Plaintiffs have adequately alleged that a taking occurred.[5] The main remaining question is whether the Plaintiffs have timely brought their claim within six years after accrual. 28 U.S.C. § 2501. I conclude that they did, at least for purposes of the pleadings stage. That leads to a subsidiary question of whether Plaintiffs have standing; I conclude that some do, while others must be dismissed.

## I. Statute of Limitations

### A. Stabilization

Applying the statute of limitations in this case depends on when Plaintiffs' claims accrued. Determining the accrual date depends, in turn, on when the taking "stabilized." I therefore begin with an overview of the law of stabilization.

---

[4] This Court has jurisdiction under the Tucker Act to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department … in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act is "a jurisdictional statute [that] does not create any substantive right enforceable against the United States for money damages," *United States v. Testan*, 424 U.S. 392, 398 (1976) (citing *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605–07 (1967)), parties asserting Tucker Act jurisdiction must "identify a substantive right for money damages against the United States separate from the Tucker Act itself." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (citing *Testan*, 424 U.S. at 398). That requires a "money-mandating" law, *i.e.*, a provision that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained … and is reasonably amenable to the reading that it mandates a right of recovery in damages." *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (quotes and citations omitted) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983), and *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 473 (2003)). The Takings Clause of the Fifth Amendment is a money mandating law, *see Williams v. United States*, 289 U.S. 553, 581 (1933); *Jan's Helicopter Serv.*, 525 F.3d at 1309; *see also United States v. Dickinson*, 331 U.S. 745, 748 (1947), so claims for just compensation are within this Court's subject matter jurisdiction.

[5] Am. Compl. ¶¶ 1–24; *see Coates v. United States*, 117 Ct. Cl. 795, 797 (1950) ("We can conceive of a no more direct invasion of a man's property than the alleged deposit upon it of several hundred thousand tons of sand[.]").

When the government effects a physical occupation of property, the Takings Clause of the Fifth Amendment categorically requires the government to pay just compensation. *Loretto*, 458 U.S. at 441; *Cedar Point Nursery*, 594 U.S. at 147–48; *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 978 (Fed. Cir. 2023). A takings claim accrues when (a) "all events have occurred which fix the liability of the Government" and (b) "the plaintiff 'was or should have been aware' that the claim existed." *Ideker Farms*, 71 F.4th at 975 (quoting *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006), and *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000)); *see also Etchegoinberry v. United States*, 132 F.4th 1374, 1379 (Fed. Cir. 2025).

Sometimes, the government can incur Takings Clause liability with a discrete act — for example, when the government assumes title to a particular property through a formal condemnation process. *Cedar Point Nursery*, 594 U.S. at 147 (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 374–75 (1945), and *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 270–71 (1943)). But at other times, a taking results from a gradual physical process that the government sets in motion. *Banks v. United States*, 314 F.3d 1304, 1308 (Fed. Cir. 2003) (citing *Boling*, 220 F.3d at 1370–71); *Applegate v. United States*, 25 F.3d 1579, 1584 (Fed. Cir. 1994). In those cases, when the events establishing the government's liability and putting the property owner on notice unfold unpredictably over an extended period of time, courts determine the accrual date by applying the "stabilization doctrine." *See, e.g.*, *Etchegoinberry*, 132 F.4th at 1379–81; *Ideker Farms*, 71 F.4th at 975; *Mildenberger*, 643 F.3d at 945.

The stabilization doctrine provides that when a taking results from a gradual process, the property owner's claim does not accrue until the "situation becomes stabilized," *i.e.*, when the results of the process "have so manifested themselves that a final account may be struck." *Ideker Farms*, 71 F.4th at 975 (quoting *Nw. La. Fish & Game Preserve Comm'n v. United States*, 446 F.3d 1285, 1290–91 (Fed. Cir. 2006)). The key is that stabilization occurs "once the permanent nature of the Government action is evident, regardless of whether the damages are complete and fully calculable." *Mildenberger*, 643 F.3d at 946 (quoting *Goodrich*, 434 F.3d at 1336); *Fallini v. United States*, 56 F.3d 1378, 1381–82 (Fed. Cir. 1995).

One aspect of stabilization is whether the government will remediate the physical process and undo the taking. The mere *possibility* of remediation is not enough to affect stabilization. *See Etchegoinberry*, 132 F.4th at 1380–81. But when the government has indicated that it will reverse its occupation of property, the property owner is left in "justifiable uncertainty about the permanency of the taking." *Banks*, 314 F.3d at 1309; *Applegate*, 25 F.3d at 1582 (characterizing the "promise" of

remediation as an "event hindering stabilization"). Because permanence is one of the elements of a gradual physical takings claim, *Boling*, 220 F.3d at 1370–71; *Banks v. United States*, 741 F.3d 1268, 1281 (Fed. Cir. 2014), justifiable uncertainty "delay[s] stabilization" and, by the same token, accrual. *Banks*, 314 F.3d at 1309 (citing *Boling*, 220 F.3d at 1372);[6] *Frazer/Exton Dev., L.P. v. United States*, 809 F. App'x 866, 870 (Fed. Cir. 2020) ("'[J]ustifiable uncertainty about the permanency of the taking,' however, prevents accrual of a physical takings claim.") (quoting *Boling*, 220 F.3d at 1372); *Yankton Cnty., S.D. v. United States*, 135 Fed. Cl. 620, 629 (2017) ("In other words, the 'permanent nature of the taking' must be 'evident' for a claim to accrue.") (quoting *Banks*, 314 F.3d at 1308), *aff'd*, 753 F. App'x 905 (Fed. Cir. 2019).

Justifiable uncertainty has both objective and subjective components. *Biloxi Marsh Lands Corp. v. United States*, 156 Fed. Cl. 301, 314 (2021) (citing *Mildenberger*, 643 F.3d at 947, and *Boling*, 220 F.3d at 1372). First, the government's promises and actions must have been objectively sufficient to justify uncertainty about the taking's permanence. *Id.* (citing *Mildenberger*, 643 F.3d at 947); *see also Etchegoinberry*, 132 F.4th at 1380–81. Second, the property owner must have been subjectively aware of those facts and personally uncertain as a result. *Biloxi Marsh Lands Corp.*, 156 Fed. Cl. at 314 (citing *Boling*, 220 F.3d at 1372); *see, e.g., Henderson Cnty. Drainage Dist. No. 3 v. United States*, 60 Fed. Cl. 748, 756 (2004) (explaining that documents not acquired by plaintiffs until discovery could not form the basis of their alleged justifiable uncertainty), *aff'd*, 147 F. App'x 967 (Fed. Cir. 2005).

One final aspect of justifiable uncertainty — largely unaddressed by the parties[7] — is the question of how *much* of the taking the government must promise to remediate in order to delay stabilization. The Federal Circuit has explained that "it is the uncertainty surrounding the permanent nature of the taking, and not the uncertainty surrounding the ultimate extent of the [] damage, that is critical in determining whether the situation has stabilized." *Boling*, 220 F.3d at 1372; *see also Mildenberger*, 643 F.3d at 946. A taking that is only partially remediated is still

---

[6] This Court has sometimes treated stabilization and uncertainty as "two distinct doctrines." *Biloxi Marsh Lands Corp. v. United States*, 156 Fed. Cl. 301, 308 (2021). That interpretation is logically appealing on the theory that stabilization of the physical takings process and uncertainty about the government's remediation should be analyzed separately. Nonetheless, the Federal Circuit has characterized the possibility of remediation as going to whether a taking has stabilized. *See Applegate*, 25 F.3d at 1582; *Banks*, 314 F.3d at 1309–10. That is best explained by treating uncertainty about remediation as part of the stabilization analysis.

[7] My original Opinion granting the government's first motion to dismiss expressly reserved "the legal question of how much promised remediation is necessary for the justifiable-uncertainty doctrine to apply." Opinion & Order at 3. Neither party briefed the issue on the renewed motion to dismiss. Plaintiffs only mentioned it in passing in a supplemental brief that was supposed to address another issue. Pls.' Suppl. Br. on 2004 Final Report at 2.

permanent, even if the measure of just compensation is smaller. *See, e.g.*, *Whiteland Holdings, L.P. v. United States*, 141 Fed. Cl. 702, 711 (2019) (explaining that it is the permanency of the taking, "not the taking's damages quantum," that determines whether the claim has accrued), *aff'd sub nom. Frazer/Exton Dev.*, 809 F. App'x 866. Put another way, once a taking occurs, partial remediation neither reverses the taking nor provides the compensation required by the Fifth Amendment. Either way, a promise of partial remediation is unlikely to bear on stabilization in a way that delays accrual. I have not located authority from this Court or the Federal Circuit plainly finding justifiable uncertainty based solely on a promise of partial remediation. But be that as it may, even if a promise of partial remediation *were* enough to create justifiable uncertainty, in this case Plaintiffs are only arguing that the government promised a complete remediation. Tr. at 42.

### B. Analysis

Plaintiffs filed this claim on June 10, 2022; for their claim to be timely, they must prove their claim accrued on or after June 10, 2016. Plaintiffs argue that because of the doctrine of justifiable uncertainty, their claim accrued on June 13, 2016, when the T-Groin Project was complete. Pls.' Resp. at 16. Defendant instead argues that the claim accrued sometime between 1995 and 2003. Def.'s Mot. at 14.

As shown above, to prove that the date of stabilization was extended by justifiable uncertainty, Plaintiffs must demonstrate that they were personally uncertain about the permanency of the taking and that their uncertainty was objectively reasonable based on government actions or promises. *See* Opinion & Order at 2; *Biloxi Marsh Lands Corp.*, 156 Fed. Cl. at 314 (citing *Mildenberger*, 643 F.3d at 947–48, and *Boling*, 220 F.3d at 1372). I take Plaintiffs at their word — under penalty of perjury — that Plaintiffs subjectively believed that the sand accumulation would be remediated in its entirety. Pls.' Affidavits at 2–14. There is also evidence that they were personally aware of whatever the government represented about its remediation plans. Decl. of Breslof.[8] That leaves the question of whether Plaintiffs have proven their expectation was objectively reasonable in light of the government's actual promises and actions.

To the extent that the physical process of the taking and the government's mitigation efforts can be separated, the record shows that the physical encroachment of sand should have been apparent to Plaintiffs by the late 1990s and certainly the

---

[8] The credibility of the declarants is of course a topic for discovery, subject to resolution at trial if need be.

early 2000s.[9] Plaintiffs admit that the complained-of sand accumulation was evident by at least 1997, Am. Compl. ¶ 4, and aerial images confirm that sand had begun accumulating by 1996, with a substantial beach present by 1998, Aerial Photos at 2–3. The Corps's study on the effects of the Coney Island Project, completed in 1998, confirmed that sand accreting to Gravesend Bay was a result of erosion from Sea Gate Beach. Decl. of Ciorra ¶ 4. Further, individuals in the Sea Gate community demonstrated their awareness of the problem by requesting government action to redress the sand accretion since at least the early 2000's. *See* Am. Compl. ¶¶ 8, 16. At the latest, the 2003 determination of government liability in *Vaizburd* should have put Plaintiffs on notice of their claim. *See* Am. Compl. ¶¶ 62, 64 (relying on *Vaizburd* as evidence of government liability); *Vaizburd*, 57 Fed. Cl. at 233. No party claims the *Vaizburd* litigation was unripe when it was filed or decided, and the finding of liability was upheld by the Federal Circuit, *Vaizburd*, 384 F.3d at 1281, so the gradual physical process must have stabilized by then. The exact date is not clear from the record.

Plaintiffs therefore need evidence that sometime within six years after the physical taking became apparent, the government promised to remediate it. That evidence appears in at least two documents in the record.[10]

First, Mr. Breslof declared that Corps representatives promised complete remediation. Decl. of Breslof ("[T]he Army Corps[] of Engineers was going to remove

---

[9] This Court has, as mentioned above, previously set the date of the taking on December 31, 1995. *See Vaizburd*, 57 Fed. Cl. at 230; *Prakhin*, 122 Fed. Cl. at 489. That date is not well explained in the relevant decisions. *See Vaizburd*, 57 Fed. Cl. at 230 (stating that the Court reached that date "[a]fter examining the aerial photographs, and considering the testimony of Mr. Vaizburd"); *Prakhin*, 122 Fed. Cl. at 489 (following *Vaizburd*). Factual conclusions based on the *Vaizburd* trial record are not binding in this case. *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court."); *Salter v. United States*, 119 Fed. Cl. 359, 363 (2014) (explaining a trial court cannot "take judicial notice of, or even be persuaded by, facts found in another proceeding based on a different record") (citing *Allison v. United States*, 80 Fed. Cl. 568, 596 (2008)); *see also* Restatement (Second) of Judgments § 27 cmt. a., cmt. c. (1982) (explaining that when "an issue of fact" is litigated, that determination is conclusive in subsequent litigation between the *same* parties).

[10] One of this Court's decisions in *Prakhin* held that the plaintiff in that case was justifiably uncertain until the Sea Gate Project was complete in 2016. *Prakhin v. United States*, 131 Fed. Cl. 706, 718 (2017). Plaintiffs rely heavily on the Court's factual findings to argue that they, too, were justifiably uncertain. Pls.' Resp. at 19–21. But that reliance is problematic because the two cases rely on different factual records. *See W. Coast Gen. Corp.*, 39 F.3d at 315; *Salter*, 119 Fed. Cl. at 363. For example, the Court's decision in *Prakhin* relied on certain materials — *e.g.*, Mr. Prakhin's deposition and publications of the Corps, *see Prakhin*, 131 Fed. Cl. at 713 — that are not in the record here. In addition, the *Prakhin* decision does not mention the FLR Report, *id.* at 710 (citing a "Sea Gate Brochure" but not the actual report); *see also Prakhin*, 122 Fed. Cl. at 485 (citing the "Sea Gate Project Informational Slides," but not the actual report), suggesting that the Court did not have access to the best evidence of what the Sea Gate Project was (or was not) supposed to accomplish.

all that sand and restore their properties to their original state as they were before this Project."). Although the government suggests that I discount Mr. Breslof's assertion, Tr. at 24–25; *see also* Def.'s Reply at 5–6, I decline to make an adverse credibility determination on a paper record at the pleadings stage.

Second, Mr. Breslof's declaration is corroborated by the government's own documents. According to the 2004 FLR Report, the T-Groin Project was expected to lower the sand accretion to water level, *see* FLR Report at 288, and "to eventually restore the shoreline to prior prevailing depths and shoreline configuration," *id.* at 74.

The government advances alternative interpretations of that language. It proposes, for example, that the FLR Report was not referring to the sand on Plaintiffs' properties, *see* Def.'s Mot. at 26–27; Def.'s Suppl. Br. on 2004 FLR Report at 1–3, that removing sand down to water level would not restore the property to its pre-Coney Island Project conditions, *see* Tr. at 72–73 (referencing *Vaizburd*, 57 Fed. Cl. at 222 (stating that in 1989 the water was approximately three to four feet deep immediately on the other side of the bulkhead)); Def.'s Mot. at 27, or that other portions of the FLR Report predict only that the T-Groin Project would "*reduce* the accumulation of sediment in Gravesend Bay." Def.'s Mot. at 25 (quoting FLR Report at 12) (emphasis added); *see also* FLR Report at 48. Those readings may be plausible. But the question is not necessarily what the FLR Report actually means, but whether it was sufficient to justify uncertainty on the part of the property owners. *Biloxi Marsh Lands Corp.*, 156 Fed. Cl. at 314 (citing *Boling*, 220 F.3d at 1372); *see also Etchegoinberry*, 132 F.4th at 1380–81. The government has not explained its readings sufficiently for me to depart from the apparent meaning of at least some of the Corps's own language.

The government also argues that the FLR Report was contingent because it only described a *potential* remediation plan. Def.'s Suppl. Br. on 2004 Final Report at 2. According to the government, the FLR Report only described Gravesend Bay as one of several *potential* borrow sites, and the remediation plan was contingent on congressional funding. *Id.* at 2–3. However, the FLR Report selected a plan — "Alternative 7," FLR Report at 13, 69 — which appears to say that sand would be drawn from *all* the potential borrow sites, including Gravesend Bay. *Id.* at 73 ("Once construction of the T-groins is completed, initial fill material for the beach nourishment would be obtained from the Coney Island borrow area, the accumulated sediment along the Gravesend Bay shoreline, and a deposition base off Norton Point."), 74–75 (discussing compatibility and pricing of all borrow area sources), 76 (explaining that for the initial construction of the T-groins, sand would be taken from the offshore borrow area and from the Gravesend Bay shoreline). Although the government is correct that the plan described in the FLR Report could not have been

executed without funding, a government remediation plan can be sufficient to generate uncertainty even if it is not yet funded. *See, e.g.*, *Banks*, 314 F.3d at 1309 (holding that "a legally binding promise or duty or a matter requiring a congressional appropriation" is not required for justifiable uncertainty to delay accrual).

I therefore conclude — at least for purposes of this stage of the case — that the FLR Report contains material sufficient to justify property owners in expecting a complete remediation of the sand accumulation at their properties until the completion of the project on June 13, 2016.

The government brings a variety of other arguments, which I reject in turn.

First, the government argues that Plaintiffs have forfeited reliance on the relevant aspects of the FLR Report. Def.'s Suppl. Br. on 2004 Final Report at 3.[11] But Plaintiffs have been consistent in arguing that their claims are timely and that the FLR Report supports timeliness. *See* Am. Compl. ¶¶ 12, 16, 55; Pls.' Resp. at 6–9. At any rate, Plaintiffs did not put the FLR Report in the record; the government did. *See* Am. Compl. at 3–4, 13 (citing the FLR Report); Def.'s Mot. Ex. 2 (attaching the FLR Report). Having placed the whole FLR Report before the Court, the government cannot object when it turns out not to support its position. *Snakenberg v. United States*, 15 Cl. Ct. 809, 813 (1988) (explaining that a party "cannot rely on evidence for his own purposes and subsequently object to unfavorable conclusions drawn from it") (citing *Waller v. United States,* 198 Ct. Cl. 908, 915 (1972)); *see also Greenleaf's Lessee v. Birth*, 30 U.S. 132, 137–38 (1831) ("In the ordinary course of things the party offering evidence is understood to wave any objection to its competency as proof. ... It is not competent for a party to insist upon the effect of one part of the papers constituting his own evidence, without giving the other party the benefit of the other facts contained in the same paper.").

Besides, forfeiture applies to issues, not arguments. *See Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1338 n.11 (Fed. Cir. 2005) (citing *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001)); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1370–71 (Fed. Cir. 2002). Not only have the parties presented the issue of timeliness, but it is a jurisdictional matter that the Court must address *sua sponte* when needed. *John R. Sand & Gravel*

---

[11] The government characterizes the omissions as a waiver, *see* Def.'s Suppl. Br. on 2004 Final Report at 3, which is not exactly right. "The terms waiver and forfeiture — though often used interchangeably by jurists and litigants — are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) (quotes and alterations omitted). But I can tell what the government meant.

*Co.*, 552 U.S. at 132. I may therefore reach any subsidiary questions about whether particular pieces of evidence militate for or against timeliness.

Second, the government argues that I should use the 1995 accrual date mentioned in the *Vaizburd* and *Prakhin* decisions. Def.'s Mot. at 14–16 (citing *Vaizburd*, 57 Fed. Cl. at 230, and *Prakhin*, 122 Fed. Cl. at 489). But as mentioned above, those decisions do not explain exactly how they reached that date. Nor has the government given any reason why fact determinations in those cases are binding in this one.

Third, the government points to statements it made in litigation after the FLR Report. Def.'s Mot. at 32.[12] The government's reply in support of its motion to dismiss in *Prakhin v. United States*, No. 14-924L, which it filed on April 20, 2015, stated that the government had never planned to fully remediate the taking. *See* Reply at 6, *Prakhin v. United States*, No. 14-924L, ECF 14 (contending the Sea Gate Project "has never included a plan, proposal, or promise to remove sand from any properties"); *id.* at 7 ("[T]he Corps never promised to remove sand that has amassed and restore Plaintiff's property. ... Thus, the permanence of the accumulated sand at issue in Plaintiff's claim has never been in doubt."). This Court's 2015 decision denying the motion and ordering jurisdictional discovery repeated the government's position. *See Prakhin*, 122 Fed. Cl. at 490; *see also Prakhin v. United States*, 131 Fed. Cl. 706, 710 (2017) ("The Government emphasizes that the purpose of the Sea Gate Project was to prevent further sand from accreting on [Mr. Prakhin's] property, not to remove the sand that previously accumulated."). But litigation arguments, of course, are rarely treated as an agency's official position. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *Boyd v. Off. of Pers. Mgmt.*, 851 F.3d 1309, 1314 n.2 (Fed. Cir. 2017) ("Where Congress has delegated authority to an agency, it 'has delegated to the administrative official and not to appellate counsel.'") (quoting *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 628 (1971)). The Corps's expectations about a project presumably appear in its official documents describing the project — not in the briefs of its lawyers trying to limit its liability in court.

That leaves the case as follows. Because the record does not give me sufficient grounds to adopt the 1995 accrual date mentioned in *Vaizburd* and *Prakhin*, I conclude only that the accumulation of sand on Plaintiffs' properties should have been

---

[12] The government also mentions the *Vaizburd* Court's statement that "what the Corps planned to do by way of sand removal would not have restored the pre-taking condition." Def.'s Mot. at 31 (quoting *Vaizburd*, 57 Fed. Cl. at 224). But that was published in 2003, the year before the FLR Report. And the Corps itself represented in *Vaizburd* that its plan to construct a series of T-groins on Sea Gate Beach was a "long term solution to the Gravesend problem." *Vaizburd*, 57 Fed. Cl. at 224. *Vaizburd* could therefore be read as consistent with Plaintiffs' expectation of remediation.

evident sometime between the late 1990s and early 2000s. Accrual could have been delayed by justifiable uncertainty within six years after that time. The submitted affidavits and declarations indicate that Plaintiffs were subjectively uncertain because of representations by the government. Statements in the 2004 FLR Report appear sufficient to create that uncertainty. So, I find that Plaintiffs have carried their burden to establish this Court's jurisdiction. *Trusted Integration, Inc.*, 659 F.3d at 1163.[13]

## II. Standing

The government also argues that several Plaintiffs lack standing to sue because they did not own their properties when the takings claims accrued, or because they are successors in interest to the property owners who received compensation in *Vaizburd*. Def.'s Mot. at 33–35. Even in light of the accrual analysis presented above, certain Plaintiffs must be dismissed on those grounds.

As the government explains, *see* Def.'s Mot. at 33–34, takings claims ordinarily "belong to the party that owned the property when it was taken, not to parties with later-arising interests." *Nix v. United States*, 174 Fed. Cl. 260, 268 (2024) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001), and *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1263 (Fed. Cir. 2017)); *see also CRV Enters. v. United States*, 626 F.3d 1241, 1249 (Fed. Cir. 2010) ("It is well established that only persons with a valid property interest at the time of the taking are entitled to compensation."); *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). Identifying which party owns a takings claim goes to standing, which is a jurisdictional issue. *Mississippi v. United States*, 146 Fed. Cl. 693, 699 (2020).

Here — for purposes of the pleadings — the claim did not accrue until June 13, 2016. Only Plaintiffs who owned their property at the time of stabilization have standing to bring a takings claim. *Danforth v. United States*, 308 U.S. 271, 283–85 (1939) ("[A]t the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment."); *see also Cooper v. United States*, 827 F.2d 762, 764 (Fed. Cir. 1987) (holding that a plaintiff who acquired title after the gradual physical taking began but before it stabilized was entitled to compensation). Plaintiff George Kardasis acquired his property in December 2019, Am. Compl. ¶ 45 — after the claim accrued — and therefore lacks standing.

A related standing problem arises for Plaintiff Michelina Sabatella. Ms. Sabatella alleges that she has owned her property since 1960. Am. Compl. ¶ 39. But it in fact appears that she conveyed her property to a trust in 2007. Def.'s Mot. at 34;

---

[13] Although I cannot dismiss on statute of limitations grounds based on the present record, whether Plaintiffs will ultimately prove on the merits that their claims were timely remains to be seen.

Def.'s Mot. Ex. 12 ("Sabatella Deed") (ECF 37-12). Plaintiffs do not disagree. That means that at the time of the taking in June 2016, legal title to the property was held not by Ms. Sabatella, but by the trust. *See Cane Tenn., Inc. v. United States*, 60 Fed. Cl. 694, 701 (2004) ("Trust beneficiaries ... do not have legal ownership of the trust property. ... 'The trustee is that person in the trust transaction who holds the legal title to the property subject to the trust, for the benefit of the beneficiary.'") (quoting 76 Am. Jur. 2d *Trusts* § 206). The general rule is that the "trustee has the exclusive authority to sue third parties who injure the beneficiaries' interest in the trust." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 567 (1990); *see Shaw v. United States*, 131 Fed. Cl. 181, 207 (2017), *aff'd*, 900 F.3d 1379 (Fed. Cir. 2018); *see also* 76 Am. Jur. 2d *Trusts* § 597, Westlaw (database updated May 2025); Restatement (Second) of Trusts § 280 cmt. f (Am. L. Inst. 1959). Ms. Sabatella does not have standing to bring a takings claim on behalf of the trust property. *See, e.g.*, *Mississippi*, 146 Fed. Cl. at 699–700 (holding that the plaintiff-trustee, and not the plaintiff-beneficiary, had standing to bring the Fifth Amendment takings claim); *see also* Restatement (Second) of Trusts § 282 cmt. d ("[I]f property held in trust is taken by eminent domain, the beneficiary cannot maintain a suit in equity to recover compensation.").

In addition, Plaintiffs Elena Groisberg and Mikhail Zats are the successors in interest of the Vaizburds, who in fact received compensation. Am. Compl. ¶ 31; Def.'s Mot. at 34; Def.'s Mot. Ex. 13 ("Vaizburd Deed") (ECF 37-13); Pls.' Resp. at 22 (conceding that Mr. Zats and Ms. Groisberg are successors in interest to the Vaizburds); *see Vaizburd*, 67 Fed. Cl. at 504. An award of just compensation "goes to the owner at the time of the taking, and [] the right to compensation is not passed to a subsequent purchaser." *Palazzolo*, 533 U.S. at 628. In any event an actual award of damages extinguishes a claim. *Haddock v. United States*, 161 Fed. Cl. 6, 17 (2022) (citing *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308 (1893), *Little v. Bowers*, 134 U.S. 547 (1890), and *San Mateo Cnty. v. S. Pac. R.R. Co.*, 116 U.S. 138 (1885)); *McDermott v. United States*, 95 Fed. Cl. 70, 74 (2010) (citing *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1331 (Fed. Cir. 2005)); *Burwell v. United States*, 22 Ct. Cl. 92, 99 (1887) ("A claim ... merged in an award which has been satisfied in full is extinguished."). Allowing them to pursue compensation would effectively allow double recovery. *See Nix*, 174 Fed. Cl. at 269.

The remaining Plaintiffs allegedly acquired their properties before June 13, 2016 and still owned their properties on that date. Am. Compl. ¶¶ 25 (Plaintiff Richard T. Scarpaci, November 2007), 27 (Plaintiff Leonard Rosenblum, September 1998), 29 (Plaintiff Crystal Parham, November 2015), 33 (Plaintiff Avital Linder, October 2015), 35 (Plaintiffs Sergey and Luba Semenov, September 2012), 37

(Plaintiff Anna Shteynberg, August 2010–January 2021), 41 (Plaintiff Patrick Fioriglio, August 2005), 43 (Plaintiff Irwin M. Janklowicz, November 2001). The government does not dispute those allegations, which I therefore take as true. *Trusted Integration, Inc.*, 659 F.3d at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)); *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). Those Plaintiffs have adequately pleaded standing.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss (ECF 37) is **GRANTED IN PART** and **DENIED IN PART**. The claims of Plaintiffs Elena Groisberg, George Kardasis, Michelina Sabatella, and Mikhail Zats are **DISMISSED** for lack of standing. The motion to dismiss is otherwise **DENIED**.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge